IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JONATHAN LOLLAR, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff*, | § § | Case No. 4:22-cv-820 |
| v. | § § § | JURY TRIAL DEMANDED |
| POLARIS INDUSTRIES, INC., a Delaware corporation; POLARIS SALES, INC., a Minnesota corporation; and POLARIS INDUSTRIES, INC., a Minnesota corporation, | § § § § § § | |
| *Defendants*. | § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff JONATHAN LOLLAR ("Plaintiff"), individually and on behalf of all other similarly situated, alleges the following upon information and belief, based upon investigation of counsel, published reports, and personal knowledge:

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action against defendants POLARIS INDUSTRIES, INC. (the Delaware corporation), POLARIS SALES, INC., and POLARIS INDUSTRIES, INC. (the Minnesota corporation and parent corporation of the other two Polaris defendants) (collectively, "Defendants" or "Polaris") on behalf of all persons who purchased in Texas, in the four years preceding this Complaint, Polaris Utility Terrain Vehicles ("UTVs") (they are also called side-by-sides) that Polaris claimed/advertised/marked/certified that the vehicles' rollover protection system ("ROPS") complied with the department of Occupational Safety and Health Administration ("OSHA") requirements/standards of 29 C.F.R. § 1928.53 (which is for agricultural tractors).

2. "Class Vehicles" is defined to include, but is not limited to the following models: Polaris RZR XP 4 Turbo S; Polaris RZR XP 4 Turbo EPS; Polaris RZR PRO XP Ultimate; Polaris RZR XP Turbo S; Polaris RZR XP Turbo EPS; Polaris RZR XP 4 1000 High Lifter; Polaris RZR XP 4 Turbo S Velocity; Polaris RZR PRO XP Premium; Polaris RZR XP 4 1000 Premium; Polaris RZR XP 4 Turbo; Polaris RZR XP 4 Turbo Dynamix Edition; Polaris RZR XP 4 Turbo Fox Edition; Polaris RZR XP 1000 Trails & Rocks; Polaris RZR PRO XP; Polaris XP Turbo S Velocity; Polaris RZR XP 4 1000 Limited Edition; Polaris RZR XP 4 1000 EPS; Polaris RZR XP 4 1000 Ride Command; Polaris RZR XP 1000 EPS High Lifter; Polaris RZR XP 1000 High Lifter; Polaris RZR XP 1000 EPS; Polaris RZR XP 1000 EPS LE; Polaris RZR XP 1000 Ride Command; Polaris RZR XP 4 1000; Polaris RZR XP Turbo; Polaris RZR XP Turbo Fox Edition; Polaris RZR XP Turbo Dynamix Edition; Polaris RZR XP Turbo S; Polaris RZR XP 1000 Premium; Polaris RZR 4 1000; Polaris RZR XP 1000 Limited Edition; Polaris RZR XP 1000; Polaris RZR S 1000; Polaris RZR S 1000 EPS; Polaris RZR S 900 Premium; Polaris RZR 900 Fox Edition; Polaris RZR S 900; Polaris RZR S 900 EPS; Polaris RZR S4 900 EPS; Polaris RZR 900 Premium; Polaris RZR RS1; Polaris RZR 900; Polaris RZR 4 900 EPS LE; Polaris RZR 4 900 EPS; Polaris RZR 900 EPS Trail; Polaris RZR 900 EPS; Polaris RZR 900 EPS XC Edition; Polaris RZR 900 Polaris; Polaris RZR 4 800 EPS LE; Polaris RZR 4 800 EPS; Polaris RZR S 800 EPS; Polaris RZR S 800 LE; Polaris RZR S 800; Polaris RZR 800 EPS LE; Polaris RZR 800 EPS XC Edition; Polaris RZR 800 Polaris Pursuit; Polaris RZR 800; Polaris RZR 570 Premium; Polaris RZR 570 EPS Trail LE; Polaris RZR 570 EPS Trail; Polaris RZR 570 EPS LE; Polaris RZR 570 EPS; Polaris RZR 570; Polaris RZR S 570 570 EPS; Polaris RZR 170 EFI; Polaris RZR Turbo EPS; Polaris Ranger Crew XP 1000 EPS NorthStar Edition; Polaris Ranger XP 1000 NorthStar Edition; Polaris Ranger Crew XP 1000 EPS NorthStar HVAC Edition; Polaris Ranger XP 1000 EPS NorthStar HVAC Edition;

Polaris Ranger XP 1000 EPS NorthStar Edition; Polaris Ranger Crew XP 1000 High Lifter Edition; Polaris Ranger XP 1000 High Lifter Edition; Polaris Ranger Crew XP 1000 EPS High Lifter Edition; Polaris Ranger XP 1000 EPS High Lifter Edition; Polaris Ranger Crew XP 1000 EPS Back Country Edition; Polaris Ranger XP 1000 EPS Back Country Limited Edition; Polaris Ranger Crew XP 1000 EPS 20th Anniversary Limited Edition; Polaris Ranger XP 1000 EPS 20th Anniversary Limited Edition; Polaris Ranger Crew XP 1000 Texas Edition; Polaris Ranger XP 1000 Texas Edition; Polaris Ranger Crew XP 1000 Premium; Polaris Ranger Crew XP 1000 EPS Premium; Polaris Ranger XP 1000 Premium; Polaris Ranger Crew XP 1000 EPS; Polaris Ranger XP 1000 EPS; Polaris Ranger XP 1000 EPS Ranch Edition; Polaris Ranger XP 1000 EPS Hunter Edition; Polaris Ranger XP 1000; Polaris Ranger Crew XP 900 EPS; Polaris Ranger XP 900 EPS; Polaris Ranger XP 900 EPS Premium; Polaris Ranger Crew XP 900; Polaris Ranger XP 900; Polaris Ranger Crew XP 900-6 EPS; Polaris Ranger Crew XP 900-6; Polaris Ranger Crew XP 900-5 EPS; Polaris Ranger Crew XO 900-5; Polaris Ranger XP 900; Polaris Ranger XP 900 EPS; Polaris Ranger XP 900 EPS High Lifter Edition; Polaris Ranger XP 900 EPS Hunter Deluxe Edition; Polaris Ranger XP 900 EPS Hunter Edition; Polaris Ranger XP 900 EPS NorthStar Edition; Polaris Ranger XP 900 EPS Trail Edition; Polaris Ranger XP 900 EPS LE; Polaris Ranger XP 900 EPS Browning LE; Polaris Ranger XP 900 Deluxe; Polaris Ranger XP 570 EPS; Polaris Ranger XP 570; Polaris Ranger Crew 1000 Premium; Polaris Ranger 1000 Premium; Polaris Ranger Crew 1000; Polaris Ranger 1000 EPS; Polaris Ranger 1000; Polaris Ranger Crew 900 EPS; Polaris Ranger Crew 900 EPS LE; Polaris Ranger Crew 900; Polaris Ranger Crew 900-6 EPS; Polaris Ranger Crew 900-6; Polaris Ranger 800 EFI; Polaris Ranger 800 Midsize; Polaris Ranger 800 EPS LE; Polaris Ranger Crew 800 EPS; Polaris Ranger Crew 800; Polaris Ranger 800 EPS; Polaris Ranger Crew 570-6; Polaris Ranger Crew 570-4 Premium; Polaris Ranger Crew 570-4

EPS; Polaris Ranger Crew 570-4; Polaris Ranger Crew 570 EPS; Polaris Ranger Crew 570 EPS LE; Polaris Ranger Crew EPS 570 Full-Size; Polaris Ranger 570 EPS; Polaris Ranger 570 EPS Hunter Edition; Polaris Ranger Crew 570 EFI; Polaris Ranger 570 EFI; Polaris Ranger Crew 570 Full-Size; Polaris Ranger 570 Full-Size; Polaris Ranger Crew 570; Polaris Ranger 570; Polaris Ranger 500; Polaris Ranger 400; Polaris Ranger 150 EFI; Polaris Ranger 6X6; Polaris Ranger Diesel HST Deluxe; Polaris Ranger Diesel HST; Polaris Ranger Crew Diesel; Polaris Ranger Diesel; Polaris Ranger EV; Polaris Ranger EV LI-ION; Polaris Ranger ETX; Polaris General 4 1000 EPS Deluxe; Polaris General 4 1000; Polaris General 4 1000 EPS; Polaris General 4 1000 Ride Command Edition; Polaris General 1000 Deluxe; Polaris General 1000 Premium; Polaris General 1000; Polaris General 1000 Ride Command Edition; Polaris General 1000 Hunter Edition; Polaris General 1000 Limited Edition; Polaris General 1000 EPS; Polaris General 1000 EPS Deluxe; Polaris General 1000 EPS Hunter Edition; and Polaris General 1000 EPS Ride Command Edition.

3. Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



4. The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.[1]

---

[1] Polaris includes on the stickers that the gross vehicle weight is applied under the OSHA test, even though the test requires significantly greater weight input. U.S. District Court Judge Josephine Staton agreed that the cropped section is irrelevant. "Plaintiffs do not claim they

5. None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of their customers that their ROPS are safe because they meet this standard. They do not. Polaris has also staved off federal regulations by the U.S. Consumer Product Safety Commission ("CPSC") in part by causing the adoption of newly-created industry standards as part of the self-regulation revolution. Even after adopting farm tractor standards issued for worker safety on farms in the early 1970s, Polaris cheats and does not even meet those standards.

6. Roof strength is a vital safety concern to consumers given the strong likelihood of UTVs rolling over. The failure to meet all applicable federal and state statutes, standards, regulations, and self-adopted regulations, including OSHA 29 C.F.R. § 1928.53 requirements is material information for consumers purchasing/leasing UTVs, such as the Class Vehicles.

7. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

8. Unless otherwise stated, Plaintiff alleges that any violations by Polaris were knowing and intentional, and that Polaris did not maintain procedures reasonably adapted to avoid any such violation.

9. Unless otherwise indicated, the use of any defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that defendant's name.

---

were deceived because Defendants represent to consumers that they use one tractor weight to test their vehicles when they actually use another. Rather, Plaintiffs allege that they were deceived because, contrary to Defendants' representation on stickers affixed to class vehicles at the point of sale, the vehicles do not comply with 29 C.F.R. § 1928.53." *Guzman v. Polaris Industries, Inc.*, No. 8:19-cv-01543-FLA-KES, Dkt. 38 fn.2 (C.D. Cal. Feb, 13, 2020).

## II.  UTVS SOLD BY POLARIS

10.  A UTV is a motorized vehicle with four or more low pressure tires designed for off-road use and intended by the manufacturer primarily for recreational use by one or more persons. UTVs are a relatively new product in the motorized off-road category, and their speed and design make them unique from all-terrain vehicles ("ATVs"). The main distinction is that an ATV is defined by federal law, in part as: any motorized, off-highway vehicle designed to travel on 3 or 4 wheels, having a seat designed to be straddled by the operator and handlebars for steering control. 15 U.S.C. § 2089(e)(1)(A).

11.  A UTV, unlike an ATV, has traditional seating like an automobile with bench or bucket seats, a restraint system and is equipped with a steering wheel. UTVs are similar in design to golf carts with throttle and brake pedals. While golf carts travel approximately 15 miles per hour or less, UTVs such as the Polaris Rangers and Razors have top speeds well in excess of 60 miles per hour. Polaris UTVs are powered by strong engines with up to 181 horsepower.

12.  The images depicted below are from Polaris' most recent earnings report and website. They show the Rangers and Razors, which do not look like slow 1970s farm tractors:

 



13.     UTVs were introduced into the United States market in the late 1990s. In 1998, 2,000 UTVs were sold, all by one manufacturer. Polaris entered the market in 2000. By 2003, 20,000 UTVs were sold in the United States. That number then grew dramatically. There was a 19% growth from calendar year 2006 over 2005 levels with approximately 255,000 UTVs sold worldwide. In its second quarter of 2019 earnings report, Polaris estimated nearly 1 billion in gross sales in the quarter. Polaris possesses the top spot in the North American market share ranks and has a three-fold lead on its nearest competitor.

14.     Polaris UTVs are sold at retail with an approximate median base price of around $12,999.99 and sell at prices exceeding $20,000.00. The price is similar to entry and midsize automobiles.

## III.    JURISDICTION AND VENUE

15.     Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because Plaintiff, a resident of State of Texas, seeks relief on behalf of a Texas Class and Defendants' principal place of business is in Minnesota. In addition, the matter in controversy exceeds $5,000,000 exclusive of interest and costs. Therefore, both diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

16.     Plaintiff purchased his 2021 Polaris Razor Turbo S 4 Seater in Baytown, Texas.

17.     Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendants conducted business within this judicial district at all times relevant.

18.     Because Defendants conducted business within the State of Texas at all times relevant, personal jurisdiction is established.

## IV.     PARTIES

19.     Plaintiff is an individual who resides in Texas.

20.     Plaintiff is informed and believes, and upon such information and belief alleges thereon, that defendant POLARIS INDUSTRIES, INC. is a Delaware Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. Its agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

21.     Plaintiff is informed and believes, and upon such information and belief alleges thereon, that defendant POLARIS SALES, INC, is a Minnesota Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. Its agent for service of process in Texas is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

22.     Plaintiff is informed and believes, and upon such information and belief alleges thereon, that defendant POLARIS INDUSTRIES, INC. is a Minnesota Corporation with its principal place of business at 2100 Highway 55, Medina, Minnesota 55340-9770. It is the parent company of both defendant POLARIS INDUSTRIES, INC. the Delaware Corporation and

POLARIS SALES, INC. Its agent for service of process is CT Corporation System Inc., 101 Date Street N., St. Paul, Minnesota 55117-5603.

23.     Polaris, at all relevant times herein, sold vehicles to members of the general public as well as designing, testing, manufacturing, inspecting, distributing, recalling them, and warning and instructing users on the safe use of the motor vehicles, including the subject vehicle, in exchange for valuable consideration in McLennan County, Texas.

24.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and was the owner, agent, servant, joint venturer and employee, each of the other and each was acting within the course and scope of its ownership, agency, service, joint venture and employment with the full knowledge and consent of each of the other Defendants. Plaintiff is informed and believes, and based thereon allege, that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

25.     At all times mentioned herein, each and every Defendant was the successor of the other and each assumes the responsibility for each other's acts and omissions.

## V.     FACTUAL ALLEGATIONS

### A.     *The Government Considers Regulations for UTVs*

26.     Polaris UTVs are subject to product safety standards administered by the CPSC, not the National Highway Traffic Safety Administration ("NHTSA"). UTVs are "consumer products" that can be regulated by the CPSC via the Consumer Product Safety Act. 15 U.S.C. § 2052(a).

27.     On December 12, 2008, the CPSC met with representatives of the Recreational Off-Highway Vehicle Association ("ROHVA") to discuss the development of a standard to be certified

by the American National Standards Institute ("ANSI"). The standards discussed, at this time, involved stability standards. In June 2009, ROHVA sent over proposed voluntary standards, including one for the ROPS. Ken D'Entremont and Mary McConnell attended the meeting for Polaris. Paul Vitrano attended for ROHVA.

28.     In 2009, the CPSC began the process of considering regulatory action of UTVs. (In CPSC nomenclature they are ROVs.) It issued a Notice of Proposed Rulemaking. The CPSC noted that farm vehicles have maximum speeds of 25 mph or less, while UTVs at the time could exceed 30 mph. The CPSC identified its databases of Injury and Potential Injury Incidents (IPII) and In-Depth Investigation (INDP) for incidents between January 2003 and August 2009 involving 181 incidents, including 116 fatalities and 152 other injuries. The injuries included deglovings, fractures and crushing injuries to victims' legs, feet, arms and hands, resulting in amputations at times. 69% of the injuries occurred in rollover incidents.

29.     By April 2013, the CPSC was aware of 428 incidents resulting in 231 fatalities and 388 other injuries. 150 of the 231 deaths were in rollover accidents.

**B.     *The 1970s OSHA Regulation for ROPS on Farm Tractors***

30.     In 1972, the U.S. Department of Labor concerned that "[t]ractor roll-overs have been a major cause of employee injury and death on the farm" appointed the Standards Advisory Committee on Agriculture to make a ROPS standard a priority.

31.     After the notice of proposed rulemaking notice period, the Department of Labor, via OSHA promulgated 29 C.F.R. §§ 1928.51 (definitions), 1928.52 and 1928.53 (ROPS strength test).

32. The test for the ROPS strength involves forces applied to the ROPS and it measures the deflection caused by the force. If there is too much deflection the ROPS fails the tests. How much force is applied, according to the regulation depends on the tractor weight.

33. Tractor weight is defined pursuant to 29 C.F.R. §§ 1928.51(a)(4) as:

> "Tractor weight" includes the protective frame or enclosure, all fuels, and other components required for normal use of the tractor. Ballast shall be added as necessary to achieve **a minimum total weight** of 110 lb. (50.0 kg.) per maximum power take-off horse power at the rated engine speed or the maximum, gross vehicle weight specified by the manufacturer, **whichever is the greatest**. From end weight shall be at least 25 percent of the tractor test weight. **In case power take-off horsepower is not available, 95 percent of net engine flywheel horsepower shall be used**.

34. Thus, the weight to be tested is either the gross vehicle weight (about 2,000 to 2,400 pounds), or the 110 pounds multiplied by the maximum power take off horse power. The statute specifically indicates if the tractor is not one where you can measure the "power take off" horsepower, or PTO, then 95 percent of net engine flywheel horsepower is used.

### C. *ROHVA, a Polaris-Controlled Entity, Adopts the 29 C.F.R. § 1928.53 Test*

35. In order to avoid CPSC promulgating actual regulations, Polaris and the industry set up new standards with which they would comport. One of these was for the strength of the ROPS. This was done via ROHVA, which is controlled, in part by Polaris. ROHVA adopted the tractor ROPS test of 29 C.F.R. §§ 1928.51, *et seq.*, This was then made into an ANSI standard.

### D. *Polaris Cheats and None of the Class Vehicles Pass the 29 C.F.R. § 1928.53 Test*

36. The Class Vehicles consisting of 2015 to 2029 Polaris UTVs are believed to have horsepower ranging from approximately 168 horsepower to 68 horsepower for the smaller 2-door Rangers.

37. For every model of Class Vehicles, Polaris tested the vehicles by the gross vehicle weight. Polaris intentionally refused to test at 110 pounds times either the maximum power take

off horsepower or 95% of the net engine flywheel horsepower. For example, the 2019 RZR XP 4 Turbo is tested at 2750 pounds (the gross vehicle weight is 2713 pounds). It has 168 horsepower. 95% of 168 horsepower is 159.6. Rounding down, would be 159. So, 110 pounds multiplied by 159 is 17,490. The correct "W" or tractor weight in the test, should be 17,490 pounds. Polaris intentionally refused to use the correct tractor weight of approximately 17,490 pounds. Instead, it used 2,750 pounds. Polaris did not comply with the test. Polaris misled all Class Members.

38.     The Polaris vehicles are lighter and have much stronger engines than farm tractors. Hence, their gross vehicle weights are comparatively lower, and 110 pounds times their PTO horsepower (or 95% of the net fly wheel horsepower) is going to be larger than that of the farm tractors.

39.     In fact, the gross vehicle weight, due the specifications of the Class Vehicles should never be used for the OSHA tests. 110 pounds times the PTO horsepower (or 95% of the net fly wheel horsepower) of each Class Vehicle is substantially greater than the gross vehicle weights.

40.     Not a single Class Vehicle has been tested using the proper Tractor Weight pursuant to 29 C.F.R. §§ 1928.51, *et seq.*, Polaris advertised and told the public that each and every Class Vehicle passed the OSHA 29 C.F.R. § 1928.53 test. None did.

41.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

42. Polaris is believed to have digital computer models of the ROPS that can be inputted into commercially available computer aided engineering programs. They test the ROPS via an outside entity and using the computer aided engineering systems. It would be easy to ascertain whether the ROPS meet the tests by inputting the correct Tractor Weight instead of the lower gross vehicle weight.

**E.** ***Polaris Cheats by Improperly Distributing the Load and None of the Class Vehicles Pass the 29 C.F.R. 1928.53 Side Load Test***

43. The Class Vehicles' ROPS, being an integral part of each vehicle's enclosure, are required to conform with the "side load" test as described in 29 C.F.R. § 1928.53(d)(2)(iii)(F). In essence, the integrity of the structure is tested by applying force to one side of the vehicle. Specifically, the test requires that:

> When the protective-frame structures are an integral part of the enclosure, apply the side load according to Figure C-13, and record $L$ and $D$ simultaneously. Static side-load application shall be distributed uniformly on the frame over an area perpendicular to the direction of load application [...] **This side load shall be applied to the longitudinal side farthest from the point of rear-load application**.

29 C.F.R. § 1928.53(d)(2)(iii)(F)



FIGURE C-13 - SIDE LOAD APPLICATION.

44.     Polaris cheats when it performs the side load test. Instead of following OSHA guidelines and applying force to a single side, Polaris uses a tool commonly known as a "load distributor" during the test to distribute the load parallel across the top of the enclosure to the other side of the vehicle. The "load distributor" does as the name suggests and spreads out the applied force. By doing so, force is applied to ***both*** sides of the enclosure and not the one side as required by the OSHA standard.

45.     Polaris purposefully uses the load distributor for every side load test to ensure that every Class Vehicle "passes" the test.

46.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

**F.      *Plaintiff's Transactions***

47.     On or around December 19, 2021, Plaintiff purchased a 2021 Polaris RZR XP 4 Turbo in Baytown, Texas.

48.     Plaintiff saw and read the stickers on the 2021 Polaris RZR XP 4 Turbo which contained the sticker at the time of sale as depicted below, suggesting that Polaris vehicles meet these OSHA requirements:



49.     Plaintiff read the sticker on the 2021 Polaris RZR XP 4 Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends. Plaintiff , in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 Poalris RZR XP 4 Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 Polaris RZR XP 4 Turbo.

50.     Had the sticker not been on the 2021 Polaris RZR XP 4 Turbo that stated that the ROPS structure met OSHA requirements, Plaintiff would not have purchased the 2021 Polaris RZR XP 4 Turbo.

51.     The sticker placed on Plaintiff's Polaris vehicle are placed on all the Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

52.     None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of itscustomers that the ROPS structures are safe because they meet this standard. They do not. **They do not test the with the proper engine power in determining the vehicle weight**.

53.     But for Defendants' misrepresentations, misleading and fraudulent statements, Plaintiff would not have purchased the vehicle or would have paid substantially less for the vehicle than the purchase price of upwards of $20,000.00. Plaintiff did not receive the benefit of the bargain.

54.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal

and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

## VI.　CLASS ALLEGATIONS

55.　Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or other applicable law, on behalf of themselves and all others similarly situated, as members of the proposed class (hereafter "the Class") defined as follows:

> All persons in Texas that purchased a Class Vehicle in the four years
>
> preceding the filing of this Complaint.

56.　Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or other applicable law, on behalf of themselves and all others similarly situated, as members of the proposed subclass (hereafter "the Load Class") ("the Class" and "the Load Class" are referred to collectively in the singular throughout") defined as follows:

> All persons in Texas that purchased a Class Vehicle in the four years
>
> preceding the filing of this Complaint where Polaris used a load
>
> distributor when testing the ROPS strength for certification.

57.　Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

58.     Plaintiff does not know the exact number of persons in the Class, but believes them to be in the several hundreds, if not thousands, making joinder of all these actions impracticable.

59.     The identity of the individual members is ascertainable through Defendants' and/or Defendants' agents' records or by public notice.

60.     There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class.

61.     Plaintiff will fairly and adequately protect the interests of the Class.

62.     Plaintiff retained counsel experienced in consumer class action litigation.

63.     Plaintiff's claims are typical of the claims of the Class, which all arise from the same operative facts involving Defendants' practices.

64.     A class action is a superior method for the fair and efficient adjudication of this controversy.

65.     Class-wide damages are essential to induce Defendants to comply with the federal and state laws alleged in the Complaint.

66.     Class members are unlikely to prosecute such claims on an individual basis since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, e.g., securities fraud.

67.     Plaintiff and the Class seek injunctive relief against Defendants to preclude Defendants from advertising that the Class Vehicles comply with OSHA 29 C.F.R. § 1928.53 until they meet the tests using the correct Tractor Weight and side-load application as defined in 29 C.F.R. §§ 1928.51(a)(4) and (d)(2)(iii)(F).

68.     Plaintiff and the Class seek to enjoin Defendants' illegal business practices of advertising and informing consumers that the Class Vehicles meet all applicable federal and state

statutes, standards, regulations, including OSHA requirements of 29 C.F.R § 1928.53, when they in fact, do not.

69. As such, Plaintiff and the Class seek public injunctive relief to prevent Defendants from continuing with their unlawful business acts and practices as alleged herein to ensure that Defendants do not continue to harm the general public by continuing to engage in the unlawful business acts and practices as alleged herein.

70. Plaintiff, individually, and on behalf of all Texas consumers, seek individual, representative, and public injunctive relief and any necessary order or judgments that will prevent Defendants from continuing with their unlawful business acts and practices as alleged herein.

71. Defendants acted on grounds generally applicable to the Class thereby making appropriate final declaratory relief with respect to the Class as a whole.

72. Members of the Class are likely to be unaware of their rights.

73. Plaintiff contemplates providing notice to the putative class members by direct mail in the form of a postcard and via publication.

74. Plaintiff requests certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(2) for equitable relief.

75. This action is properly maintainable as a class action. This action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements for a class action.

76. **Numerosity**: The proposed Class is so numerous that individual joinder of all members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff does not know the number of members in the Class, but believe the Class members number in the thousands, if not more. Plaintiff alleges that the Class may be ascertained by the records maintained by Defendants.

77.     Plaintiff and members of the Class were harmed by the acts of Defendants in at least the following ways: violation of the Texas Deceptive Trade Practices Act ("DTPA"); fraudulent concealment; and breach of the implied warranty of merchantability.

78.     **Commonality**: There are questions of law and fact common to Plaintiff and the Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, without limitation:

i.      Whether Defendants failed to test the Class Vehicles using the correct Tractor Weight as defined by 29 C.F.R. § 1928.51(a)(4);

ii.     Whether Defendants failed to test the Class Vehicles using the correct side load application as defined by 29 C.F.R. § 1928.53(d)(2)(iii)(F);

iii.    Whether Defendants' conduct violated the DTPA;

iv.     Whether Defendants perpetuated a fraud on Plaintiff and the Class Members by failing to disclosure material facts surrounding its safety-testing of the Class Vehicles;

v.      Whether Defendants perpetuated a fraud on Plaintiff and the Class Members by advertising its Class Vehicles as "meet[ing] OSHA requirements of 29 C.F.R. § 1928.53";

vi.     Whether Plaintiff and Class Members are entitled to restitution under the DTPA;

vii.    Whether Plaintiff and Class Members are entitled to declaratory/injunctive relief under DTPA;

viii.   Whether Plaintiff and Class Members are entitled to attorneys' fees and costs under DTPA; and

ix.     Whether Plaintiff and Class Members are entitled to statutory damages.

79.     **Typicality**:  Plaintiff's claims are typical of the claims of members of the Class, as Plaintiff was subject to the same common course of conduct by Defendants as all Class Members. The injuries to each member of the Class were caused directly by Defendants' wrongful conduct as alleged herein.

80.     **Adequacy of Representation**:  Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff retained counsel with substantial experience in handling complex class action litigation and litigation against product manufacturers. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class, and have financial resources to do so.

81.     **Superiority of Class Action**: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Class members have little interest in individually controlling the prosecution of separate actions because the individual damage claims of each Class member are not substantial enough to warrant individual filings. In sum, for many if not most Class members, a class action is the only feasible mechanism that will allow them an opportunity for legal redress and justice. The conduct of this action as a class action in this forum, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

82.     Moreover, individualized litigation would also present the potential for varying, inconsistent, or incompatible standards of conduct for Defendants, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. The adjudication of individual Class members' claims would also, as a practical matter, be

dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class members to protect their interests.

83.     Plaintiff and Class members have suffered and will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with regard to the members of the Class as a whole.

## VII.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT ("DTPA"),**
**Tex. *Bus. & Com. Code* §§ 17.46, *et seq.***
**(Against All Defendants on Behalf of Plaintiff and the Class)**

84.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-84 of this Complaint, as though fully set forth herein.

85.     The DTPA makes unlawful any "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce […]" Tex. *Bus. & Com. Code* § 17.46. A plaintiff may maintain an action under the DTPA where: (1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of the plaintiff's damages. *See id.* § 17.50(a); *see also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).

86.     Plaintiff and Class members are "consumers" within the meaning of the DTPA. Within the relevant period, Plaintiff and Class members each purchased at least one of Polaris' Class Vehicles.

87.     Polaris engaged in "false, misleading, or deceptive acts" within the meaning of the DTPA.

88.     The DTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices," including but not limited to:

(a) Tex. *Bus. & Com. Code* § 17.46(b)(2): "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

(b) Tex. *Bus. & Com. Code* § 17.46(b)(5): "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not";

(c) Tex. *Bus. & Com. Code* § 17.46(b)(7): "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another";

(d) Tex. *Bus. & Com. Code* § 17.46(b)(13): "knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service";

(e) Tex. *Bus. & Com. Code* § 17.46(b)(22): "representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced"; and

(f) Tex. *Bus. & Com. Code* § 17.46(b)(24): "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]"

89.     Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



90.     The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

91.     Polaris's false, misleading, and/or deceptive acts constituted a producing cause of Plaintiff and the Class members' damages within the meaning of the DTPA.

92.     In or around December 19, 2020, Plaintiff purchased a 2021 Polaris RZR XP 4 Turbo in McLennan County, Texas.

93.     Plaintiff saw and read the stickers on the 2021 Polaris RZR XP 4 Turbo which contained the sticker at the time of sale as depicted below, suggesting that their vehicles meet these OSHA requirements:



94.     Plaintiff r read the sticker on the 2021 Poalris RZR XP 4 Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends. Plaintiff , in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 Polaris RZR XP 4 Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 Polaris RZR XP 4 Turbo.

95.     Had the sticker not been on the 2021 Poalris RZR XP 4 Turbo that stated that the ROPS structure met OSHA requirements, Plaintiff would not have purchased the 2021 Polaris RZR XP 4 Turbo.

96.     None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of their customers that their ROPS are safe because they meet this standard. They do not.

97.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

98.     Plaintiff and Class Members have been damaged by Polaris' violation of the DTPA and are entitled to relief.

## SECOND CAUSE OF ACTION
### FRAUD
### (Against All Defendants on Behalf of Plaintiff and the Class)

99.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1-98 of this Complaint, as though fully set forth herein.

100.    Polaris misrepresented that the Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

101.   Plaintiff saw and read the stickers on the 2021 Polaris RZR XP 4 Turbo which contained the sticker at the time of sale as depicted below, suggesting that their vehicles meet these OSHA requirements:



102.   Plaintiff read the sticker on the 2021 Polaris RZR XP 4 Turbo and understood the language to mean that the vehicle's ROPS structure met federal standards for safety and that the vehicle was safe for use by him, his family, and friends. Plaintiff , in seeing and reading the sticker, relied on the language contained therein to purchase the 2021 Polaris RZR XP 4 Turbo. If the sticker said that the ROPS structure failed to meet OSHA requirements, he would not have purchased the 2021 Polaris RZR XP 4 Turbo.

103.   Had the sticker not been on the 2021 Polaris RZR XP 4 Turbo that stated that the ROPS structure met OSHA requirements, Plaintiff would not have purchased the 2021 Polaris RZR XP 4 Turbo.

104.   Polaris includes nice stickers like the following to suggest that their vehicles meet these OSHA requirements:



105.   The stickers are placed on Class Vehicles and are visible at the point of sale where consumers are also informed that Class Vehicles meet all applicable standards and regulations, including self-adopted regulations, and meet OSHA requirements of 29 C.F.R. § 1928.53, when in fact, they do not.

106. None of the Class Vehicles sold by Polaris meet the OSHA requirements of 29 C.F.R. § 1928.53. Polaris tells all of their customers that their ROPS systems are safe because they meet this standard. In reality, they do not meet this standard and Polaris is aware of this fact.

107. Defendants fraudulently informed Plaintiff and the Class that the Class Vehicles passed the OSHA 29 C.F.R. § 1928.53 test when Polaris used the inappropriate gross vehicle weight instead of 110 pounds multiplied by either the maximum power take off horsepower of 95% of the net flywheel horsepower, which would be between four and nearly seven times a greater force for the test. This induced Plaintiff and other Class members to purchase the Class Vehicles at inflated prices based on those misrepresentations.

108. Defendants fraudulently informed Plaintiff and the Class that the Class Vehicles passed the OSHA 29 C.F.R. § 1928.53 test when Polaris used a load distributor during the side load test to distribute the load parallel across both sides of the enclosure and not one side as required by the OSHA standard. This induced Plaintiffs and Class members to purchase the Class Vehicles at inflated prices based on those misrepresentations.

109. Plaintiff and Class members were ignorant of these material facts and did not stand in equal opportunity with Polaris to know they existed. They had no way of knowing that Polaris cheated the OSHA 29 C.F.R. § 1928.53 test by inappropriately using the gross vehicle weight and by using a load distributor for the side load test. These customers could not have reasonably expected that Polaris would fail to comply with requirements of 29 C.F.R. § 1928.53 and subsequently advertise its vehicles as meeting the OSHA requirements of 29 C.F.R. § 1928.53.

110. Polaris deliberately withheld this information to induce the Plaintiff and Class members to purchase its Class Vehicles, and at inflated prices. Polaris had a duty to refrain from advertising its Class Vehicles as OSHA-compliant when it was aware they were not in fact OSHA-

compliant and also knew that Plaintiff and the Class members were ignorant of that fact and did not have an equal opportunity to discover it.

111.     In failing to provide consumers accurate and truthful information about the true nature and characteristics of the Class Vehicles pertaining to compliance with all applicable federal and state statutes, standards, and regulations, including self-adopted regulations, specifically OSHA requirements of 29 C.F.R. § 1928.53, consumers are damaged based on the benefit of the bargain, that they have to retrofit the Class Vehicles for adequate safety, and are faced with a strong likelihood of serious injury or death.

112.     Polaris' conduct is ongoing and continues to this date.

113.     Had Plaintiff and the Class members been aware of these undisclosed facts, they would not have purchased Polaris' vehicles, or would have paid significantly less for Polaris' vehicles.

114.     Plaintiff and Class members have been injured by Polaris' fraudulent conduct.

115.     Furthermore, Plaintiff's injuries resulted from Polaris' gross negligence, malice, or actual fraud, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a).

116.     The conduct of Polaris' actions or omissions described above, when viewed from the standpoint of Polaris at the time of the act or omission, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff and others.  Defendants had actual, subjective awareness of the risk involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and others.

117.    Based upon the facts stated herein, Plaintiff requests exemplary damages be awarded to Plaintiff and Class Members

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

1.    Certifying the Class as requested herein;

2.    Providing such further relief as may be just and proper.

3.    Appointing Plaintiff and his counsel to represent the Class;

In addition, Plaintiff and the Class members pray for further judgment as follows:

4.    Restitution of the funds improperly obtained by Defendants;

5.    For exemplary damages under the DTPA and common law Fraud.

6.    Any and all statutory enhanced damages;

7.    All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;

8.    For equitable and injunctive relief; and

9.    Any and all other relief that this Court deems just and proper.

Dated:  March 14, 2022     Respectfully submitted,

*/s/ Jarrett L. Ellzey*

Jarrett L. Ellzey
Texas Bar No. 24040864
Leigh Montgomery
Texas Bar No. 24052214
Ghazzaleh Rezazadeh
Texas Bar No.
**ELLZEY & ASSOCIATES, PLLC**
1105 Milford Street
Houston, Texas 77066
Telephone: (713) 554-2377
Facsimile: (888) 276-3455
*jarrett@ellzeylaw.com*
*leigh@ellzeylaw.com*
*ghazzaleh@ellzeylaw.com*

Jesenia A. Martinez
California Bar No. 316969
**CARPENTER & ZUCKERMAN**
8827 W. Olympic Blvd.
Beverly Hills, CA 90211
Telephone: (310) 273-1230
Facsimile: (310) 858-1063
*jmartinez@cz.law*
(*Pro Hac Vice* forthcoming)

Todd M. Friedman
California Bar No. 216752
Adrian R. Bacon
California Bar No. 280332
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard Street, Suite 780
Woodland Hills, California 91367
Telephone: (877) 619-8966
Facsimile:  (866) 633-0028
*tfriedman@toddflaw.com*
*abacon@toddflaw.com*
(*Pro Hac Vice* forthcoming)

And

Christopher W. Wood
California Bar No. 193955
**DREYER BABICH BUCCOLA
WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, California 95826
Telephone: (916) 379-3500
Facsimile:  (916) 379-3599
*cwood@dbbwc.com*
(*Pro Hac Vice* forthcoming)

***Attorneys for Plaintiff and all other similarly situated***

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all such triable claims.

Dated:  March 14, 2022

Respectfully submitted,

/s/ Jarrett L. Ellzey

Jarrett L. Ellzey
Texas Bar No. 24040864
Leigh Montgomery
Texas Bar No. 24052214
Ghazzaleh Rezazadeh
Texas Bar No.
**ELLZEY & ASSOCIATES, PLLC**
1105 Milford Street
Houston, Texas 77066
Telephone: (713) 554-2377
Facsimile: (888) 276-3455
*jarrett@ellzeylaw.com*
*leigh@ellzeylaw.com*
*ghazzaleh@ellzeylaw.com*

John P. Kristensen
California Bar No. 224132
**CARPENTER & ZUCKERMAN**
8827 W. Olympic Blvd.
Beverly Hills, CA 90211
Telephone: (310) 273-1230
Facsimile: (310) 858-1063
*kristensen@czlaw.com*
(*Pro Hac Vice* forthcoming)

Todd M. Friedman
California Bar No. 216752
Adrian R. Bacon
California Bar No. 280332
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard Street, Suite 780
Woodland Hills, California 91367
Telephone: (877) 619-8966
Facsimile:  (866) 633-0028
*tfriedman@toddflaw.com*
*abacon@toddflaw.com*
(*Pro Hac Vice* forthcoming)

Christopher W. Wood
California Bar No. 193955
**DREYER BABICH BUCCOLA
WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, California 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599
*cwood@dbbwc.com*
(*Pro Hac Vice* forthcoming)

***Attorneys for Plaintiff and all other similarly situated***